UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

NICHOLAS CAVANAUGH
    Plaintiff,

Case No.:

Hon.:

v.

JAMES D. MCBRIDE, Sheriff
of Otsego County, and MATTHEW
J. NOWICKI, Undersheriff of
Otsego County, in their Individual
and Official Capacities, and the COUNTY
OF OTSEGO, a Michigan Municipality

    Defendants,

Joni M. Fixel (P56712)
Collin H. Nyeholt (P56712)
Fixel Law Offices, PLLC
Attorney for Plaintiff
4084 Okemos Rd., Ste B
Okemos, MI 48864
(517) 332-3390

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, Nicholas Cavanaugh ("Plaintiff"), by and through his attorneys, the Fixel of Fixel Law Offices, PLLC, and for his complaint, states as follows:

### Jurisdiction and Parties

1. This is an action to enforce civil rights arising out of Plaintiff's employment relationship with the County of Otsego, Office of the Sheriff, pursuant to the United States Constitution and the

1

common laws of Michigan.

2. Nicholas Cavanaugh, ("Plaintiff") is a resident of and domiciled in Johannesburg, MI. At the times discussed within this Complaint, he was a Sheriff's Deputy with the Otsego County Office of the Sheriff.

3. Defendant Otsego County is a Michigan municipal organization. The entity known as the "Sheriff's Office of Otsego County" is an arm of Otsego County.

4. Defendant James D. McBride ("Defendant McBride") is the Sheriff of Otsego County who reports to the Defendant County.

5. Defendant Matthew J. Nowicki ("Defendant Nowicki") is the Undersheriff of Otsego County who reports to Defendant McBride and Defendant County.

6. The events giving rise to this cause of action occurred in Otsego County, Michigan.

7. A substantial part of the events and omissions giving rise to the claims stated herein occurred in this District and all defendants are subject to the personal jurisdiction of this judicial district. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391.

8. Claims in this action arise in part under 42 USC § 1983. Jurisdiction is therefore vested in this Court by virtue of 28 U.S.C. §§ 1331.

## Background Facts

9. Plaintiff repeats and re-alleges the factual statements and legal assertions contained in the previous numbered paragraphs as if fully restated herein.

10. On November 25, 1998 Plaintiff submitted his resume to Sheriff McBride and requested consideration for positions at the Otsego County Sheriff's Department.

11. His application was successful and Cavanaugh began work as a Sheriff's Deputy of the Otsego County Sheriff's Office on January 4, 1999.

2

12. Though he had some disciplinary incidents early on, Plaintiff's later career was punctuated with commendations for his excellence of service.

13. Plaintiff worked as a Shift Supervisor, Tazer Instructor, Firearms Instructor, Marine Safety Instructor, and an A.T.V. Safety Instructor for the Department. He also calibrated P.B.T.'s as a class IIIa Operator.

14. On July 23, 2006 Sergeant John D. Dye recognized Plaintiff for excellent, diligent police work that resulted in the issue of felony warrants in a fatal snowmobile accident.

15. On July 23, 2007 Sgt. Dye again recognized Cavanaugh for "extremely well written" reports in a breaking and entering case he handled, and "highly professional manner in conducting the investigation."

16. In 2007, Plaintiff was selected for the Mutual Aid Task Force (SWAT) team, a prestigious position within the department.

17. Plaintiff and another deputy were given a psychological evaluation by Dr. Hill for the SWAT position. Plaintiff passed, the other deputy did not. However, the other deputy continues to work.

18. On March 25, 2009 Ron Karr, Former Shieriff of Mont Morency County, and an Otseog County Court Officer, wrote a letter and recognized Plaintiff for his excellence in working with him on his tazer training.

19. Plaintiff also received numerous letters of acknowledgment and appreciation from citizens, Gaylord, and Sheriff McBride.

20. Plaintiff also served as the Union President.

21. On February 4, 2010 Plaintiff, acting as Union President, filed a grievance against the administration of the Otsego County Sheriff's Department regarding inadequacy of training for the use of "jump packs."

22. Jail Cook Tim Hohl provided the "jump pack" training.

23. It was alleged, during the grievance proceedings, that Hohl was inept in training the deputies in the proper use of the jump packs.

24. The grievance resolved in favor of management.

25. Prior to March 5, 2010 Defendant Nowicki announced a change in schedule for the deputies.

26. Prior to the change, the deputy's shifts ran from 6:00 AM to 6:00 PM, followed by a 6:00 PM to 6:00 AM shift.

27. Defendant Nowicki had decided, with McBride's approval, to change to a 6:00 AM to 6:00 PM shift, followed by a 12:00 Noon to 12:00 Midnight shift.

28. On March 5, 2010 Plaintiff, in his capacity as Union President, met with Defendant Nowicki to discuss the scheduling change.

29. During the March 5, 2010 meeting regarding the shift change, Plaintiff expressed to Nowicki that he believed the schedule change was being implemented without properly following the procedure outlined in the Collective Bargaining Agreement.

30. Plaintiff told Defendant Nowicki that if Command should implement the change in the manner they desired, it would result in the filing of an unfair labor practice claim with the MERC.

31. The meeting between Plaintiff and Defendant Nowicki wherein the proposed implementation of the change was discussed lasted approximately 2 hours.

32. Plaintiff and Defendant Nowicki decided that the union and the administration would propose a schedule and have the proposed schedules ready to review over the weekend.

33. On Monday, March 9 2010 Plaintiff was ending his shift.

34. Plaintiff was sitting in the squad room, attempting to fill out a vacation request form for the week of March 26.

35. Plaintiff engaged in some small talk with Jail Cook, Tim Hohl.

36. Plaintiff turned his back to Hohl and opened the schedule book. He noticed, at this time, that

the administration had gone ahead and implemented the schedule, contrary to the decision he and Nowicki had reached.

37. Plaintiff expressed consternation at the implementation of the new schedule, saying "I could kill the boss."

38. The phrase "I could kill" was a common figure of speech used by the personnel at the Otsego County Sheriff's Department.

39. Deputy Trevor Winkle expressed annoyance at another deputy who had failed to show at an intersection to direct traffic as instructed by saying "I could kill" the deputy in question.

40. Defendant Nowicki, after his son crashed his truck into a tree, had stated "I'm going to kill that kid."

41. Hohl, apparently still angry about being accused of ineptitude during the grievance Plaintiff had initiated the month before, reported Plaintiff's statement to Corrections Officer Eric Pandell.

42. Hohl prepared a written statement, where he described a "monotone voice" when Plaintiff said this and said "the statement really bothered me."

43. Pandell, in contrast, indicated in his written statement that Plaintiff "might of ment it as a joke [*sic*]."

44. Pandell, nonetheless, reported Plaintiff's statement to Captain Brian Webber.

45. Webber, in turn, reported the statement to Defendant Nowicki.

46. Nowicki, though aware of Plaintiff's supposed professed desire to "kill" him, and fully aware that Plaintiff was armed, did not wear a bullet proof vest when he arrived at the building.

47. That very day, Defendant Nowicki discussed the statement with Defendant McBride.

48. Nowicki and McBride chose to suspend Plaintiff, pending an investigation of his "threatening statements."

49. When Plaintiff arrived for his shift later that evening, he was directed into Defendant

5

McBride's office.

50. Plaitniff was instructed to sit down, and was then handed a letter on department letterhead informing him that he was being placed on "administrative leave" pending an internal investigation.

51. When Plaintiff asked what the investigation was for, McBride responded "you don't need to know."

52. Though Plaintiff was accused of making "threatening statements" Nowicki and McBride did not call any other officers into the office to help protect them.

53. Defendant McBride told Plaintiff to surrender his department issued firearms and identification.

54. Plaintiff informed Defendant McBride that they were in his locker.

55. Defendant McBride told Plaintiff to go get them.

56. Plaintiff walked to his locker to retrieve his primary and secondary weapons.

57. Defendant Nowicki followed Plaintiff to his locker to retrieve the weapons.

58. Despite the "serious threats" Plaintiff was accused of having made against his life, Nowicki did not have any other officers follow Plaintiff to ensure he did not make good on his "threats" while handling his firearms.

59. Plaintiff reached into his locker, unholstered his primary weapon, unloaded it, and handed it to Nowicki. Plaintiff then reached into his locker, unholstered he secondary weapon, unloaded it, and handed it to Nowicki.

60. Despite the "serious threats" he accused Plaintiff of making, Nowicki allowed him to handle loaded weapons in his presence without wearing a bulletproof vest and without the presence of any other officers for security purposes.

61. Plaintiff was also in possession of a firearm he had purchased with his own funds. He was allowed to retain that weapon, despite the supposed "serious threats" he had made to Nowicki and

6

y

McBride's safety.

62. After surrendering his badge and department issued firearms, and still in possession of his own firearm, Plaintiff was allowed to collect his things and leave the building.

63. Despite the "serious threats," Plaintiff was never asked to surrender his key card to the court house, which gave this "dangerous man" access to the judges' chambers.

64. Plaintiff also was never asked to surrender his master key, nor his *key to the armory*.

65. Despite the "serious threats" attributed to Plaintiff, neither McBride nor Nowicki were concerned enough to make sure Plaintiff did not have access to

    a. The judges' chambers, or

    b. The *armory*.

66. Though they had decided that his "threatening statements" were "serious," Defendants Nowecki and McBride did not assign an escort to watch Plaintiff leave the building.

67. In contrast, Nowicki was not investigated when he said "I'm going to kill that kid" after his son wrecked his truck.

68. Winkle was not investigated when he said that he "could kill" the deputy who failed to show up to direct traffic as instructed. In fact, he was later promoted to Sergeant, despite the "threatening language" he used.

69. No other deputy, sergeant, or other person employed by Otsego County or the Otsego County Office of the Sheriff has ever been investigated or terminated for making the statement "I could kill someone."

70. On March 17, 2010 Defendant McBride wrote a letter to Plaintiff, advising him that he was being investigated and faced termination for having made "threatening statements" in violation of the work rules.

71. Defendants Nowicki and McBride also submitted the "threatening statements" to the Otsego

7

County Prosecutor's office, in an attempt to have Plaintiff brought up on criminal charges.

72. The Prosecutor declined to pursue these frivolous charges.

73. On March 19, 2010 Plaintiff had a Laudermill hearing regarding the "charges" against him.

74. At the hearing, Plaintiff's union representative stated that the statement was "shop talk" and nothing more. Neither management nor the union asked Plaintiff any questions pertaining to the specifics of what was said.

75. On March 26, 2010 Defendant McBride wrote Plaintiff and informed him that he had been terminated, for reason of having made "threatening statements" in violation of the work rules.

76. It bears noting that the termination was done on the same week that Plaintiff had attempted to put in for vacation, as an additional act of retaliation.

77. On April 1, 2010 Plaintiff filed a union grievance, pertaining to the termination.

78. On April 14, 2010 Plaintiff attended his Step 2 grievance hearing.

79. At the hearing, Plaintiff's union representative advised him not to comment on the statements that he had made on March 9, based on his interpretation of Plaintiff's fifth amendment privilege.

80. On April 21, 2010 the Otsego County Board of Commissioners wrote Plaintiff and informed him that his grievance was denied, because of his failure to answer.

81. Plaintiff and his union took the grievance to arbitration.

82. While waiting for the arbitration hearing, Defendant McBride released Plaintiff's disciplinary file, including incidents that had happened more than a decade before the March 9 incident, to the Gaylord Herald Times.

83. Several negative community blogs appeared after the article, lambasting Plaintiff as an "incompetent officer" because of the dated information McBride had submitted to the media.

84. On January 10, 2011 Plaintiff attended an arbitration hearing on his dismissal.

85. On April 11, 2011 the arbitrator wrote an opinion, sustaining Plaintiff's dismissal for "just

cause."

86. As the following shall demonstrate, other similarly situated officers were not fired after engaging in threatening behavior that was far more serious than that of which Plaintiff was accused.

87. Prior to 2009, Sheriff McBride hired a female deputy named Amy Moon.

88. In Mid-2009, Deputy Moon was divorcing her husband, John Klepaldo.

89. Klepaldo began dating another woman in late 2009, early 2010.

90. Moon began stalking Klepaldo's girlfriend.

91. Moon also intimidated Klepaldo's girlfriend because she was expected to testify at a child custody hearing between herself and Klepaldo.

92. The harassment was severe enough that Klepaldo's girlfriend had to petition for a Personal Protective Order so that she could feel safe leaving her own home.

93. The Michigan State Police were called and initiated an investigation of Deputy Moon for stalking and for witness intimidation.

94. While the investigation was ongoing, Nowicki and McBride told Moon that while she was on patrol, she was not to respond to any calls in Klepaldo's girlfriend's nieghborhood.

95. However, the administration did not place Moon on administrative leave and, instead, allowed her to continue to patrol the streets with department-issued firearms.

96. Despite her stalking and witness intimidation, Moon's position with Otsego County was not terminated and she was allowed to continue to serve.

97. Meanwhile, Plaintiff was placed on administrative leave, and ultimately terminated, for using a colloquial expression "I could kill the boss" after a dispute over the terms of the CBA.

### Count I: FIRST AMENDMENT RETALIATION IN VIOLATION OF 42 USC § 1983
*As to All Defendants*

98. Plaintiff repeats and re-alleges the factual statements and legal assertions contained in the

9

...

Wrong

previous numbered paragraphs as if fully restated herein.

99. Plaintiff had a clearly established right under the First Amendment of the Constitution of the United States not to be retaliated against for engaging in union activities, including bringing a grievance that the "jump training" was not in conformance with the CBA and speaking out to Nowicki about violations of the Collective Bargaining Agreement in implementing the new schedule.

100. Tim Hohl retaliated against Plaintiff for making the February, 2010 grievance affecting his inadequate training on the "jump packs" by making a spurious and specious complaint against him. Nowicki and McBride, acting under color of law, ratified this act of retaliation by suspending and, ultimately, terminating Plaintiff based on the complaint.

101. Further, Defendants Nowicki and McBride, acting under the color of law deprived the Plaintiff of his constitutional rights of the right to assemble with his fellow union members and to speak freely by retaliating and terminating Plaintiff in retaliation for the complaint he made in the March 9 meeting with Defendant Nowecki pertaining to the violations of the CBA in implementing the new schedule.

102. Defendants, acting under color of law, retaliated by firing the Plaintiff and depriving him of his job due to his exercising his free speech and right to assemble.

103. Defendants further retaliated, again under color of law, by inciting the media to print Plaintiff's disciplinary record in the local paper.

104. The Defendants could not have reasonably believed that their conduct was reasonable or within the constitutional limitations on the exercise of their authority.

105. The Defendants could not have reasonably believed that the violation of the Plaintiff's First Amendment rights is within their authority or qualified immunity.

106. Defendant Otsego County has delegated the final authority to hire and fire Sheriff's deputies,

and to make final decisions as to the policy for the hiring and firing of Sheriff's deputies, to the Sheriff.

107. Defendant McBride, the Sheriff of Otsego County, is authorized to make final decisions with respect to the hiring and firing of Sheriff's Deputies in Otsego County.

108. Defendant McBride has been granted final decision making authority to establish policy for the hiring and firing of Sheriff's deputies for the Otsego County Sheriff's Department.

109. The unlawful retaliatory actions, termination of Plaintiff's employment, therefore, was carried out by the person or entity with the final decision making authority for making employment decisions pertaining to employment of persons such as Plaintiff.

110. Defendant McBride, the person with final policymaking authority for hiring and firing decisions over Otsego County Sheriff's deputies, made a deliberate choice to terminate Plaintiff from among other alternatives, such as

    a. Suspending Plaintiff or,

    b. As he did with Officer Moon, doing nothing at all.

111. The Defendant's violations of Plaintiff's First Amendment rights described above are actionable under 42 USC § 1983.

112. As a result of the Defendant's violations set forth above, the Plaintiff suffered the following damages:

    a. Lost accrued wages and benefits,

    b. Lost prospective wages and benefits,

    c. Attorney's fees,

    d. Punitive and exemplary damages,

    e. Interest on funds wrongfully deprived.

**WHEREFORE,** the Plaintiff requests a judgment against the Defendants that would include compensation for his past and future economic and non-economic damages, exemplary damages, costs, interest, attorneys fees under 42 USC § 1983, and any other legal relief this Court deems fair and just; and any applicable equitable relief, including an injunction against any prior restraints upon protected First Amendment Free Speech and Right to Assemble.

**PLAINTIFF DEMANDS A JURY.**

Dated: 12-5, 2012

Respectfully submitted,

Jon M. Fixel (P56712)
Collin H. Nyeholt (P74132)
Attorney for the Plaintiff
4084 Okemos Rd, Ste B
Okemos, Michigan 48864
Telephone:(517) 332-3390
jfixel@fixellawoffices.com

## VERIFICATION

I, Nicholas Cavanaugh, have read and made this verified complaint and attest that those facts stated of my own knowledge are true and those matters stated of which I have been informed I believe to be true after reasonable inquiry.

Dated: 12/4/2012

*Nicholas Cavanaugh*

13