UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

NICHOLAS CAVANAUGH,

       Plaintiff,                         Case No. 12-15463
                                               Honorable Thomas L. Ludington

v.

JAMES D. McBRIDE; MATTHEW J.
NOWICKI; and COUNTY OF OTSEGO,

       Defendants.
_____/

**OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

From January 1999 to March 2010, Nicholas Cavanaugh was employed by the County of Otsego as a Sheriff's Deputy. At all relevant times, James McBride was the Sheriff of Otsego County, and Matthew Nowicki served as Undersheriff. Cavanaugh alleges that McBride and Nowicki—and through them, Otsego County—retaliated against him for protected First Amendment speech. Because Cavanaugh's speech did not address a matter of public concern, however, his claims are without merit, and the Defendants' motion for summary judgment will be granted.

**I**

Cavanaugh began his employment with the Otsego County Sheriff's Department (the "Department") on January 4, 1999. Between 1999 and 2010, Cavanagh was disciplined on numerous occasions for unacceptable conduct. At other times, he was commended for conduct that was anything but unacceptable. In their papers, the parties spend an inordinate amount of time with Cavanaugh's storied work history—Cavanaugh indicating he was a solid Sheriff's Deputy, the Defendants contending just the opposite—but that issue is not relevant to the

questions presented here. So, although the parties would like to debate Cavanaugh's employment record, the Court will not, as it is unrelated to the primary question framed by the parties' papers.

**A**

Sometime in late 2008 or early 2009, Cavanaugh was elected president of his union, representing primarily road-patrol deputies working for the Department. In January 2010, the Department began requiring that all road patrol deputies be trained in the use of a "jump pack," a device capable of starting a car with a dead battery. After they were trained, the Department required that all road patrol deputies use the jump packs to restart dead batteries in citizens' cars.

Cavanaugh and his union did not approve. On January 17, 2010, Cavanaugh sent Nowicki a letter indicating that he, and the union, felt that requiring members to use the jump packs was a "direct violation" of the terms of the collective bargaining agreement governing the parties' relationship. Defs.' Mot. Ex. U, ECF No. 14. Cavanaugh did not explain precisely why he and the union felt the use of jump packs violated the agreement. Nowicki responded the next day and established that the Department would not budge on requiring the use of jump packs:

> It is mandatory for every employee that received the original email from me dated December 29th 2009, to receive the jump pack training and, once trained, to use the jump packs when necessary. Your training, as you were informed by email, is scheduled for Thursday, January 21st at 0600. You are ordered to be there. Furthermore, upon receiving the training, you are ordered to perform the public service of jump starting a citizen's dead battery with said jump pack.
>
> As addressed in the original email, jump starting a vehicle is a public service and considered a motorist assist and part of your duties as a Deputy with the Otsego County Sheriff's Office.

Defs.' Mot. Ex. V.

Seeing that the Department was not going to waiver on the issue, Cavanaugh filed a grievance with the Police Officers' Labor Council on January 21, 2010.[1] In the grievance, Cavanaugh complained that he was "ordered to attend training on 1-21-2010 @ 0600hrs. for the use of portable car battery charging packs. After completion of such training, Deputy Cavanaugh was 'ordered to perform the public service of jump starting a citizens dead battery with said jump pack' when situations arise." Defs.' Mot. Ex. T, at 1. Cavanaugh then indicated how the issue should be settled: "Replacement and/or reimbursement of personal items that are damaged, lost, or ruined by carrying out the above order[,]" and "For the administration of the Otsego County Sheriff's Office to rescind its order of 'jump starting' vehicles." *Id*.

Four days later, Cavanaugh's grievance was denied because "[t]he jump starting of vehicles is a duty that has historically been conducted by P.O.L.C. unit members. It is the administrations stance that it is a public service that the P.O.L.C. unit members have, and will continue to perform." *Id*. at 2. In March 2010, the Otsego County Board of Commissioners issued a letter explaining why Cavanaugh's grievance was denied:

> The committee reviewed the current bargaining agreement between the County, Sheriff, and the POLC Unit and found no language that prohibited the act of jump starting a citizen's vehicle. . . . The reimbursement and/or replacement of personal items that are damaged or ruined by jump starting a vehicle would be standard practice. The desired settlement of rescinding its order of "jump starting" vehicles for all situations is denied. The County would note, the usual caveat that there are particular instances where extenuating circumstances exist and the officer reasonably feels there is an issue of safety in performing a duty which may arise.

Defs.' Mot. Ex. W, at 1.

---

[1] Cavanaugh did not indicate on the grievance form that he was bringing a "class action" or an action on behalf of his union. The Defendants conclude that the grievance was therefore filed on "[Cavanaugh's] own behalf . . . ." Defs.' Mot. 6. Cavanaugh argues to the contrary: "The circumstances reveal that this grievance was on behalf of the *unit*, addressing the *unit*'s concerns." Pl.'s Resp. 3. Because the Court is reviewing the issue in the context of a motion for summary judgment, the Court will assume that the grievance was brought by Cavanaugh on behalf of his unit, just as he suggests.

**B**

While the jump-pack incident was winding down, another issue arose in March 2010. Cavanaugh alleges in his complaint that prior to March 5, 2010, "Nowicki announced a change in schedule for the deputies." Pl.'s Compl. ¶ 25, ECF No. 1. You see, prior to the announcement, deputies were assigned one of two twelve-hour shifts—6:00 a.m. to 6:00 p.m. or 6:00 p.m. to 6:00 a.m. Allegedly, "Nowicki had decided, with McBride's approval, to change to a 6:00 AM to 6:00 PM shift, followed by a 12:00 Noon to 12:00 Midnight shift." *Id*. ¶ 27.

On March 5, 2010, Cavanaugh—in his capacity as union president—met with Nowicki to discuss the scheduling change. According to Cavanaugh, he told Nowicki "that he believed the schedule change was being implemented without properly following the procedure outlined in the Collective Bargaining Agreement." *Id*. ¶ 29. Cavanaugh expressed his intention to file an "unfair labor practice claim with the MERC" if Nowicki went forward with the change. *Id*. ¶ 30. Cavanaugh claims that he and Nowicki "decided that the union and the administration would propose a schedule and have the proposed schedules ready to review over the weekend." *Id*. ¶ 32.

But that is not what happened. On March 9, 2010, Cavanaugh was in the squad room completing a vacation request form at the end of his shift. Also in the squad room was Jail Cook Tim Hohl. After some polite conversation with Hohl, Cavanaugh opened the schedule book to complete his vacation request. That is when he noticed "that the administration had gone ahead and implemented the [new] schedule, contrary to the decision he and Nowicki had reached." *Id*. ¶ 36. Cavanaugh did not approve. Still armed and in uniform, he said, "I could kill the boss." *Id*. ¶ 37.

Hohl authored a statement on March 9, 2010, in which he indicated that Cavanaugh's comment made him "really uncomfortable; the manner in which he was acting and talking seemed very odd. I became very concerned for my superiors and wrote down exactly what was said." Defs.' Mot. Ex. AA. Hohl was particularly concerned because Cavanaugh "was armed and in uniform." *Id*. Hohl made clear that he "definitely did not take [Cavanaugh's] statement as a joke or just blowing off steam." *Id*.

Hohl then conferred with Corrections Officer Eric Pandell, who "was walking through the room" when Cavanaugh said he could kill the boss. *Id*. Pandell also authored a statement on March 9, 2010. He indicated that he heard Cavanaugh say "I should shoot the boss." Defs.' Mot. Ex. BB. Pandell was caught "off guard" by the statement, and after talking with Hohl about it, Pandell "had to agree w/ Tim Hohl that it didn't seem right that [Cavanaugh] should say 'I should shoot the boss[.]'" *Id*. Pandell also agreed with Hohl "that someone who carries a gun should not be making statemnents [sic] like deputy Cavanaugh did, even if he might of ment [sic] it as a joke." *Id*.

Based upon Hohl's and Pandell's statements, on March 9, 2010, McBride placed Cavanaugh on paid administrative leave, "effective immediately, pending an internal investigation." Defs.' Mot. Ex. CC. On March 17, 2010, McBride sent Cavanaugh a notice of hearing and opportunity for review. *See* Defs.' Mot. Ex. DD. The notice informed Cavanaugh that an investigation revealed evidence supporting charges that he failed to carry out his responsibilities as a Deputy for the Department, and that his conduct could subject him to discharge. *Id*. at 1. The notice also indicated that Cavanaugh was "entitled to respond both in writing and in person to the charges and receive a full review of the charges." *Id*.

After a *Loudermill* hearing[2] on March 19, 2010, Cavanaugh received a letter from McBride dated March 26, 2010. In the letter, McBride indicated that the Department had "carefully considered all of the information" gathered during the internal investigation, and that Cavanaugh's "employment with the Otsego County Sherriff's Department is terminated immediately. Your actions were of such a serious nature that continued employment is not possible." Defs.' Mot. Ex. EE.

## C

Cavanaugh filed a grievance after he was fired, but the County Grievance Committee denied the grievance because Cavanaugh refused to answer questions about whether he made statements concerning shooting or killing his boss. *See* Defs.' Mot. Ex. FF, at 1–2. Although Cavanaugh and his union pursued the grievance to arbitration, after an arbitration hearing on January 10, 2011, the termination of Cavanaugh's employment was sustained and his grievance was denied.

Cavanaugh then filed this suit on December 5, 2012. His complaint alleges First Amendment retaliation in violation of 42 U.S.C. § 1983. Cavanaugh indicates that he was retaliated against "for engaging in union activities, including bringing a grievance that the 'jump training' was not in conformance with the CBA and speaking out to Nowicki about violations of the [CBA] in implementing the new schedule." Pl.'s Compl. ¶ 99. Specifically, Cavanaugh claims that the Defendants, "acting under color of law, retaliated by firing [him] and depriving him of his job due to his exercising his free speech and right to assemble." *Id*. ¶ 102. Currently pending is the Defendants' collective motion for summary judgment.

---

[2] In *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), the Supreme Court held that non-probationary civil servants have a property right to continued employment, and such employment cannot be denied to employees unless they are given an opportunity to hear and respond to the charges against them prior to being deprived of that continued employment. *Id*. at 546.

## II

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). All justifiable inferences from the evidence must be drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## III

Cavanaugh's complaint alleges First Amendment retaliation for essentially three activities: bringing a grievance concerning use of the jump packs; speaking out to Nowicki about violations of the CBA in implementing the new schedule; and assembling with his union and participating in union activities. *See* Pl.'s Compl. ¶ 99. Each issue is addressed below.

### A

A prima facie case of First Amendment retaliation pursuant to 42 U.S.C. § 1983 requires the plaintiff to demonstrate the following three elements: (1) that he was engaged in constitutionally protected activity; (2) that he was subjected to adverse action or deprived of some other benefit; and (3) that the adverse action was motivated, at least in part, as a response to the exercise of constitutional rights. *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004) (citing *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003)). When the plaintiff is a

government employee, as here, "he must also demonstrate that his speech touched on matters of public concern, and that his interest in commenting upon matters of public concern outweighed the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Van Compernolle v. City of Zeeland*, 241 F. App'x 244, 248 (6th Cir. 2007) (brackets, ellipsis, and internal quotation marks omitted) (quoting *Cockrel v. Shelby Cnty. School Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001)). The purpose of the latter two requirements "is to strike a proper balance between the employee's right, as a citizen, to comment on matters of public concern and the government's legitimate interest, as an employer, in regulating the speech of its employees as a means of efficiently providing public services through its employees." *Van Campernolle*, 241 F. App'x at 248–49 (collecting cases).

The threshold issue is whether Cavanaugh's speech addressed a matter of public concern, "which is a matter of law for the court to decide." *Id*. at 249 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418–19 (2006); *Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001)). If Cavanaugh's speech does not address a matter of public concern, "there is no need to balance his interest in speech with the employer's interest in efficiency, and [Cavanaugh's] claim must fail." *Van Campernolle*, 241 F. App'x at 249 (citing *Garcetti*, 547 U.S. at 418–19). Matters of public concern are those that can "be fairly considered as relating to any matter of political, social, or other concern to the community . . . ." *Connick v. Myers*, 461 U.S. 138, 146 (1983). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48.

The Sixth Circuit has established that speech is of "public concern" if "it involves issues about which information is needed or appropriate to enable the members of society to make

informed decisions about the operation of their government." *Farhat*, 370 F.3d at 590 (citing *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003)). "Such matters of public concern are to be contrasted with internal personnel disputes or complaints about an employer's performance." *Brandenburg*, 253 F.3d at 898.

**B**

**1**

Cavanaugh first argues that the Defendants retaliated against him because of the grievance he filed concerning the jump-pack incident. But because Cavanaugh's speech did not relate to a matter of public concern, summary judgment is appropriate on this issue.

Cavanaugh claims that he filed the jump-pack grievance on behalf of his union, and thus, the grievance involves "a matter of 'public concern' . . . ." Pl.'s Resp. 16. Specifically, he claims that "filing a grievance on behalf of others, and on behalf of the union, would be in the 'public interest' such that it would be protected." *Id*. In support of this argument, Cavanaugh relies on *Boals v. Gray*, 775 F.2d 686 (6th Cir. 1985). He concludes: "If filing a grievance on behalf of others in your union is not protected . . . it is not clear what union activity would be." Pl.'s Resp. 18.

Cavanaugh's position is without merit. To begin, Cavanaugh promotes a distorted reading of *Boals*. The court in *Boals* did not hold that speech, simply because it is union-related, touches on a matter of public concern. Instead, the court established that "an employee's speech, activity or association, merely because it is union-related, does *not* touch on a matter of public concern as a matter of law." *Boals*, 775 F.2d at 693 (emphasis added).

More recent Sixth Circuit cases have developed the principles originally established in *Boals*. In *Van Compernolle*, the court held that "union-related activity on behalf of other

officers" was not a matter of public concern because the activity did not "encompass[] more than internal personnel issues[.]" 241 F. App'x at 250. Thus, the activity was not "focused on issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Id*. And, notably, although the "union-related activity" concerned "issues [that] were shared by officers other than Van Compernolle," that did not mean those activities were matters of public concern. *Id*. Instead, "[a] group effort to gain more overtime is no less an internal personnel dispute than if it were the effort of one officer." *Id*. Likewise, in *Golembiewski v. Logie*, 516 F. App'x 476 (6th Cir. 2013), the court established that an employee's speech, activity, or association does not become a matter of public concern "merely because it is union-related." *Id*. at 477 (brackets omitted) (quoting *Akers v. McGinnis*, 352 F.3d 1030, 1038 (6th Cir. 2003)). To warrant First Amendment protection, union-related speech "must still involve a matter of public concern . . . ." *Golembiewski*, 516 F. App'x at 478.

These principles, applied to Cavanaugh's jump-pack grievance, establish that his speech did not relate to a matter of public concern, regardless of the fact that it was union-related and involved other employees. During his deposition, Cavanaugh confirmed that the basis of his grievance was his belief that "as police officers or as [a] road patrol unit, [he] should not be mandated to jump start vehicles." Cavanaugh Dep. 109, *attached as* Defs.' Reply Ex. A. Although there has been some indication that Cavanaugh also wished to contest the training officers received in using the jump packs, he testified that "there is nothing . . . in [the] grievance report about [his] displeasure with who was providing the training." *Id*. at 111. In fact, Cavanaugh testified that his "grievance report only has to do with that [he] shouldn't be required to assist all motorists and should only be required to assist them in emergency situations." *Id*.

As he emphasized, "the sentiment of the grievance was [using jump packs is] not a law enforcement duty." *Id*. at 127. Just as was the case in *Van Compernolle*, Cavanaugh's grievance involves an "internal personnel dispute[]" that "advances only a private interest[,]" 241 F. App'x at 249 (citations omitted), i.e., his complaint that road-patrol deputies should not be responsible for certain job duties. Thus, Cavanaugh's speech does not involve a matter of public concern.

Of course, although he does not argue as much in his response to the Defendants' motion, Cavanaugh could contend that his speech touches on a matter of public concern because it relates to services that will be provided to public citizens. But this argument is foreclosed by *Farhat*: "passing or fleeting references to an arguably public matter do not elevate the speech to a matter of public concern where the focus or point of the speech advances only a private interest." 370 F.3d at 592–93 (internal quotation marks omitted) (collecting cases). Cavanaugh's real interest was ensuring that he and other officers would not be responsible for jump starting cars under certain circumstances; his speech did not involve "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Farhat*, 370 F.3d at 590.

**2**

The analysis concerning Cavanaugh's speech related to his work schedule is identical. Once again, Cavanaugh argues that his speech involved a matter of public concern simply because it was union-related and was on the behalf of other officers. *See* Pl.'s Resp. 17–18. But, again, speech does not involve a public concern simply because it relates to a union and is advanced on behalf of others. *Van Compernolle*, 241 F. App'x at 250; *Golembiewski*, 516 F. App'x at 477–78.

Even more than his jump-pack grievance, Cavanaugh's speech related to the deputies' work schedules is an internal personnel dispute that advances only a private interest: when he and others would have to report to work. In his deposition, Cavanaugh made clear that despite the shift change, there would still be "a 24 hour patrol[,]" Cavanaugh Dep. 129, so the public would not be affected in any way by the change to the deputies' hours. Indeed, Cavanaugh testified that "the concern with th[e] proposed [schedule] change" was that "it would have meant less days off so the deputies that had children would have to coordinate child care" and "we have grown accustomed for the last couple years being on 12 hour shifts and liked having the time off quite frankly." *Id.* at 131.

As this testimony makes clear, Cavanaugh's statements concerning the proposed schedule change did not "involve[] issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government[,]" *Farhat*, 370 F.3d at 590 (citation omitted), but instead related to internal personnel disputes that are not relevant to the public. Summary judgment is warranted here as well.

**3**

Finally, Cavanaugh alleges that he was retaliated against simply because he was a union member engaged in union activities. As established by *Boals*, there is "no doubt that an employee who is disciplined solely in retaliation for his membership in and support of a union states a valid first amendment claim under *Connick* and *Pickering*." 775 F.2d at 693 (citations omitted). Although association claims are slightly different than those relating to protected speech, the Sixth Circuit has established that there is "no logical reason . . . for distinguishing between speech and association in applying [the public concern test] to first amendment claims,

including union activities claims." *Monks v. Marlinga*, 923 F.2d 423, 425 (6th Cir. 1991) (citing *Boals*, 775 F.2d at 692). Accordingly, to succeed on this association claim, Cavanaugh's union-affiliated activities must have related to a matter of public concern. *See Monks*, 923 F.2d at 425; *see also Orr v. Trumbull Cnty.*, 77 F. Supp. 2d 853, 858 (N.D. Ohio 1999) ("the Court must determine whether the Plaintiff's associational activities touched upon a matter of public concern or were of purely personal interest.").

The only union activities Cavanaugh presents are the two discussed above—which do not touch upon matters of public concern—and the fact that he filed a grievance on behalf of Trevor Winkle. As to the third event, Cavanaugh testified during his deposition that the grievance related to Winkle's "work scheduling" and "his overtime issue," Cavanaugh Dep. 74, which are both matters of private interest, certainly not public concern. Whether Nowicki and McBride "had animus towards persons acting as the Union President," Pl.'s Resp. 15, is not relevant unless Cavanaugh's actions as union president related to matters of public concern. They did not. So Cavanaugh's claim is without merit.

**C**

Discussed above, Cavanaugh has not demonstrated that either McBride or Nowicki violated his First Amendment rights. Because he has failed to demonstrate a constitutional violation, Cavanaugh cannot overcome the individual defendants' defense of qualified immunity with respect to being sued in their individual capacities. *Anderson v. Ravenna Twp. Fire Dep't*, 159 F. App'x 619, 626 (6th Cir. 2005) (citation omitted); *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir.2002) (in order to "prevail against a defense of qualified immunity a plaintiff must first establish the constitutional right that she claims was violated by the defendants.").

As to the claims against McBride and Nowicki in their official capacities, those claims are duplicative of the claim against Otsego County. As established in *Leach v. Shelby Cnty.*, 891 F.2d 1241 (6th Cir. 1989), a suit against officers of a county "in their official capacities is . . . essentially and for all purposes, a suit against the County itself." *Id*. at 1245–46; *see also Petty v. Cnty. of Franklin, Ohio*, 478 F.3d 341, 349 (6th Cir. 2007) ("To the extent that [the plaintiff's § 1983] suit is against [the sheriff] in his *official* capacity, it is nothing more than a suit against Franklin County itself." (emphasis in original)); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.")). Thus, because Cavanaugh has raised claims against Otsego County, the claims against McBride and Nowicki in their official capacities are duplicative and will be dismissed. *See Swartz Ambulance Serv., Inc. v. Genesee Cnty.*, 666 F. Supp. 2d 721, 726 (E.D. Mich. 2009) ("claims brought against Genesee Board of Commissioners and individual Commissioners . . . are duplicative of the claim against Genesee County because official capacity suits are the equivalent of a suit against the municipality.").

And finally, because Cavanaugh has not demonstrated that McBride or Nowicki violated his constitutional rights, his claims against Otsego County are also without merit and must be dismissed. As Cavanaugh acknowledges in his response, to hold a municipality liable under § 1983, he "must establish that [the] municipality's official policy or custom caused a constitutional violation." Pl.'s Resp. 24 (citing *Monell v. Dept. of Social Servs. Of the City of New York*, 436 U.S. 658 (1978)). Because such an unconstitutional act is lacking here, Cavanaugh's claims against Otsego County itself are without merit. *See Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) ("There can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act." (citation omitted)); *Ewolski v. City of Brunswick*,

287 F.3d 492, 516 (6th Cir. 2002) ("Where, as here, a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm." (collecting cases)).

Cavanaugh's inability to demonstrate a constitutional violation is fatal to his claims against all three Defendants, and summary judgment is appropriate on all of his claims.

## IV

Accordingly, it is **ORDERED** that the Defendants' motion for summary judgment, ECF No. 14, is **GRANTED**.

It is further **ORDERED** that Plaintiff's complaint, ECF No. 1, is **DISMISSED** with prejudice. This is a final order and closes the case.

Dated: January 9, 2014                  s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 9, 2014.

                 s/Tracy A. Jacobs
                 TRACY A. JACOBS